Joyce W. Lindauer
State Bar No. 21555700
**Joyce W. Lindauer Attorney, PLLC**
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Email: joyce@joycelindauer.com

Ryan Milun (Bar No. 043412006) (to be admitted *Pro Hac Vice*)
**THE MILUN LAW FIRM, LLC**
20 Commerce Drive, Suite 135
Cranford, New Jersey 07016
Phone: 862-702-5010, ext. 1001
ryan.milun@milunlaw.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| IRONGATE AI, LLC; and ALEXANDER FUCHSMAN,<br><br>*Plaintiffs,*<br><br>v.<br><br>JONATHAN HOUK; and FORECYBER,<br><br>*Defendants.* | Civil Action No. 7:25-cv-159<br><br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, Irongate AI, LLC, with a corporate address located in Kent County, Delaware, and Alexander Fuchsman, with an address in Scotch Plains, New Jersey, for their complaint against defendants Jonathan Houk and ForeCyber, alleges and states:

## NATURE OF THE ACTION

1.      This is an action to enforce and protect the confidential business information of plaintiff Irongate AI, LLC, and to hold defendants accountable for their blatant breaches of fiduciary duty and for their liability for violations of both Federal and State law.

2.      Defendants used subterfuge, stealth, misrepresentations and omissions to effectively steal a multi-billion-dollar infrastructure project within the State of Texas from Irongate AI so that the deal could instead be secured for themselves. In addition, defendants continue to improperly use the confidential business information of Irongate AI to undermine the LLC and secure additional business to the determinant of the LLC.

3.      Moreover, in order to secure the Midland Texas Deal among other deals, defendants misappropriated the intellectual property, confidential business information. and trade secrets of Irongate, depriving Irongate AI not only of the multi-billion-dollar deal, but additional potential deals and partnerships, and its vital business assets.

4.      In one final stroke of nefarious conduct and breach of duty, defendants blocked Irongate's CEO, Alexander Fuchsman from his Irongate AI emails, Microsoft 365 Account, and administrative access to the Irongate AI systems, so that defendants could perform the theft of trade secrets behind the backs of the LLC and its other member.

## THE PARTIES

5.      Defendant, Jonathan Houk ("Houk"), with a residential address at 40 Frederick Drive, Coventry, Connecticut 06238 who can be served with process at this address, is a member of Irongate AI, LLC and at all relevant times, its Chief Technology Officer.  As part of his role as CTO, Houk was involved in securing the multi-billion-dollar infrastructure deal in Midland, Texas, that is at the heart of this litigation (the "Midland Texas Deal") as well as numerous other partnership and deals on behalf of the LLC.

6.      Defendant ForeCyber, with a business address at 40 Frederick Drive, Coventry, Connecticut 06238, who can be served with process at this address, is, on information and belief, the LLC under which defendant Houk operated in order to effectuate not only the theft of Irongate

AI's intellectual property, confidential information and trade secrets, but also to effectively steal the Midland Texas Deal and other deals and partnerships from Irongate.

7.    Plaintiff, Irongate AI, LLC ("Irongate") is an LLC formed and existing under the laws of the State of Delaware, and was originally created by defendant Houk and Alexander Fuchsman to bring a revolutionary new technology solution to market.

8.    Under the banner of Irongate AI and through the use of its confidential business information, intellectual property, trade secrets, know how, and strategies, Houk and Fuchsman were able to secure the Midland Texas Deal for Irongate AI and were in the process of finalizing the deal, as well as other deals, partnerships, and consulting arrangement when defendants took the deals for themselves.

9.    Plaintiff, Alexander Fuchsman, with a residential address in Scotch Plains, New Jersey is a member of Irongate AI and its Chief Executive Officer.  Fuchsman was integral in the development of Irongate's intellectual property, trade secrets, confidential business information, and strategies, which were improperly taken by the defendants and used to secure the Midland Texas Deal and to steal other potential deals that were earmarked for Irongate AI.

## <u>JURISDICTION AND VENUE</u>

10.    This Court has federal question jurisdiction over this action under 28 U.S.C. §1331 and under the Defend Trade Secrets Act ("DTSA") 18 U.S.C. §1836 as this action involves a claim by plaintiffs that the defendants misappropriated their trade secret information in a clear and blatant violation of the DTSA.

11.    This Court has federal question jurisdiction over this action under 29 U.S.C. § 2201 as this action requires the courts determination as to the rights and ownership of the Intellectual property of plaintiff, Irongate AI.

12.    Plaintiffs also request that this Court exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the plaintiffs State Law claims, as those claims are so related to the claims in action with the original jurisdiction of this Court.

13.    Venue exists in this District under 28 U.S.C. §1391 in that the entities in this action are "subject to the Court's personal jurisdiction with respect to the civil action in question" and because the parties regularly conduct business within this District, including in connection with the Midland Texas Deal that is at the center of this litigation and benefits or would benefit the citizens of this District.

## FACTS COMMON TO ALL COUNTS

14.    The parties to this action originally formed a partnership and created an LLC in order to develop a strategy for addressing America's datacenter problems and to further help America stay competitive in the datacenter space.

15.    The goal of the partnership was to solve several issues unique to datacenter projects, including: dealing with America's antiquated power grid which could not handle the mass production and use of Graphics Processing Units ("GPU"); national security issues related to America's datacenter infrastructure and designs; the inability to bring micro-datacenters to market quickly and efficiently; and to provide for community involvement and ownership of datacenters to support and develop local communities across the country (collectively the "GPU Problem").

16.    Over the course of several months, the parties developed technology, designs, know-how, and an otherwise innovative solution to the "GPU Problem" that would allow Irongate AI to bring GPUs to market efficiently while simultaneously significantly reducing the power requirements for GPU use.

17.   After securing a vendor to produce the necessary technology for the parties solution to the GPU Problem, Houk and Fuchsman took a "divide and conquer" approach, with Fuchsman focusing on aligning with the community and building relationships with additional partners in order to make the project a success, while Jonathan was focusing on working with the technology provider to finalize the design in order to bring the product to market.

18.   Little did Fuchsman know that instead of focusing on the design and moving the project forward together on behalf of the parties joint venture, Irongate AI, Houk was instead working on a side project using Irongate AI's intellectual property, strategy and know-how, that would benefit him (and/or the LLC he created) alone, while cutting Irongate AI out of the picture.

19.   The deal that Irongate AI was initially working on was supposed to take place in the Midland, Texas area, and included consulting in connection with the construction of a 400 mega-watt datacenter.

20.   In addition to the consulting opportunity, Irongate AI was also working with the technology provider and local communities to secure additional deals for the construction of additional datacenters in Texas, while taking on strategic partners for Irongate.

21.   While Irongate AI and Fuchsman believed that the work done by Houk was in an effort to secure the Midland Texas Deal, Houk instead decided to take the Midland Texas consulting deal for himself.

22.   Indeed, Houk engaged in several levels of improper conduct all in an effort to alienate Irongate AI and Fuchsman from the Midland Texas Deal and Irongate AI's strategic partners.

23.   First, Houk disparaged Fuchsman to Irongate's partners in order to sow distrust between the parties in order to seek to have Fuchsman removed from the deal.

24.    Next, Houk blocked Fuchsman's access to his Irongate AI email accounts and Microsoft 365 Account so that Fuchsman could not see what Houk was apparently doing behind his back and who he was communicating with.

25.    As it turned out, Houk was communicating with numerous people and entities separately, in an effort to steal the consulting project from Irongate AI.

26.    Houk then refused to sign the Irongate AI Operating Agreement – which Irongate's lawyers spent tens of thousands of dollars creating – that was necessary for Irongate AI to open a bank account and secure funding.  Houk also failed to provide necessary documents to investors, failed to honor any commitments related to the design of the technology, and even refused to attend investor meetings and calls.

27.    It was clear that Houk was trying to sabotage Irongate AI's funding.

28.    On information and belief, Houk was sabotaging Irongate AI's funding as a pretext and faux justification to allow him to go out on his own and secure the consulting project in Midland, Texas, while simultaneously using the intellectual property specifically developed for Irongate.

29.    In addition to the misconduct detailed above, Plaintiffs recently discovered that, prior to his departure from Irongate AI, Defendant Houk engaged in deliberate and unauthorized destruction and manipulation of critical company data. Specifically, Houk deleted extensive volumes of Irongate AI email communications, including but not limited to correspondence with strategic partners, investors, vendors, and internal stakeholders. These deletions occurred through the Microsoft 365 environment where Houk had administrator-level access.

30.    Further, upon review of shared storage logs and internal records, Plaintiffs have determined that Houk modified and replaced several financial files containing projected budgets,

investor-related forecasts, and internal capex planning data. These financial records were altered without authorization and were subsequently overwritten or deleted to frustrate the ability of Irongate AI and its leadership to audit company finances and defend its interests.

31.    These acts of deletion and document tampering occurred during a period in which litigation between the parties was reasonably foreseeable. At the time, Houk was aware that his actions in diverting the Midland Texas Deal and misappropriating Irongate AI's intellectual property were likely to result in legal proceedings. Despite this, Houk took deliberate steps to destroy or alter electronically stored information (ESI) with the intent to prevent its use in any future litigation or internal governance dispute.

32.    These actions have caused significant harm to Irongate AI and Fuchsman, including the loss of critical documentary evidence needed to evaluate damages, communicate with existing stakeholders, and reconstruct the events leading up to the misappropriation of trade secrets and diversion of corporate opportunity.

33.    At the time of these actions, Houk was fully aware that legal disputes were imminent. Irongate AI's operating agreement was in active negotiation, funding activities were underway, and internal disagreements had escalated. As such, litigation was reasonably foreseeable, and Houk's deletion of critical data and financial records occurred in direct anticipation of that litigation. "

34.    On information and belief, Houk's actions in deleting Irongate AI emails and altering internal financial documents occurred during a period in which litigation was reasonably foreseeable and were undertaken with the intent to prevent discovery of relevant evidence. These actions were carried out through Irongate AI's Microsoft 365 cloud-based infrastructure, including Outlook, SharePoint, OneDrive, and Excel Online—systems that operate across state lines and

constitute "protected computers" as defined under 18 U.S.C. § 1030(e)(2)(B).   As such, Plaintiffs believe these actions may constitute violations of: **18 U.S.C. § 1519** – for knowingly altering, deleting, or falsifying records with the intent to obstruct future judicial proceedings or investigations; **18 U.S.C. § 1030(a)(5)(A)** – for intentionally causing damage without authorization to protected computers used in interstate commerce and communication.

35.     These actions not only impaired Irongate AI's ability to reconstruct its corporate records and defend its interests, but also disrupted ongoing financial operations and investor engagements. Plaintiffs reserve all rights to refer this matter to the U.S. Department of Justice, Federal Bureau of Investigation, or other regulatory authorities for further investigation and potential prosecution.

36.     Ultimately, with Fuchsman having no access to the Irongate AI systems, Houk then secretly leveraged the intellectual property and business strategies of Irongate AI in order to negotiate and finalize the consulting deal, not for Irongate, but for himself and/or the separate LLCs he had created behind Fuchsman and Irongate's back.

37.     When confronted about the status of the deal, Houk brazenly informed Fuchsman that the deal was not going forward "at least not for Irongate" and all but admitted to stealing the Midland Texas Deal for himself.

38.     By this action, Irongate AI and Fuchsman are seeking to hold Houk responsible for his theft of LLC trade secrets, his interference with the Midland Texas Deal, his breaches of duty, including the fiduciary duty owed to Irongate AI and its members, his breach of applicable non-disclosure agreements, and for all damages associated with Houk's improper efforts to undermine Irongate AI and steal its property and interfere with Irongate AI's business dealings.

**FIRST COUNT**
**Violation of the Defend Trade Secrets Act 18 U.S.C § 1836– Against All Defendants**

39.    Irongate AI and Fuchsman repeat the previous allegations in the complaint.

40.    Over the course of several months, the parties to this action jointly created intellectual property – i.e., trade secrets – related to the technology, strategy, and solutions to solve America's GPU Problem in connection with the construction of datacenters across the country.

41.    The intellectual property/trade secrets were developed for and belonged to Irongate AI and were critical to Irongate AI's business model and future success.

42.    The intellectual property/trade secrets of Irongate AI are intended to be used in interstate commerce; indeed, the Midland Texas Deal was just the first of many deals that Irongate AI was seeking to secure across the country.

43.    All of the deals that Irongate AI was working on, relied upon and required the use of Irongate AI's intellectual property/trade secrets.

44.    Under the Defend Trade Secrets Act, 18 U.S.C. § 1836, a trade secret is defined as: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." (See 18 U.S.C. § 1839(3)).

45.     Misappropriation of a trade secret is defined under the Defend Trade Secrets Act as: "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who (a) used improper means to acquire knowledge of the trade secret; (b) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was (i) derived from or through a person who had used improper means to acquire the trade secret; (ii) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." (18 U.S.C. § 1839(5)).

46.     Under the Defend Trade Secrets Act, an owner of a trade secret may file a civil action in a U.S. District Court seeking relief for trade secret misappropriation related to a product or service in interstate commerce.

47.     As described above, during the negotiations of the Midland Texas Deal, instead of using the intellectual property/trade secrets of Irongate AI to finalize the deal on behalf of the LLC and its members, instead, the defendants stole the intellectual property/trade secrets of Irongate AI, and instead secured a separate consulting deal for themselves.

48.     Defendants' actions and unauthorized use of intellectual property/trade secrets to secure a separate deal for themselves, is a misappropriation of Irongate AI's trade secrets that has caused damage to Irongate AI and its other member, Alexander Fuchsman.

49.     As a result of Houk's improper actions, Irongate AI and Fuchsman have been damaged in an amount to be proven at trial, but believed to be the value of the Midland Texas consulting deal, as well as several other deals that plaintiffs believe that Houk is attempting to

secure while improperly using the intellectual property/trade secrets of Irongate AI in an amount to be proven at trial but believed to be excess of several million dollars.

**WHEREFORE**, Irongate AI and Fuchsman demand judgment against Defendants on this First Count of the Complaint as follows:

a)  Compensatory and punitive damages;
b)  Interest and costs of suit;
c)  Counsel fees as allowed by Court Rule;
d)  Such other relief as the Court may deem just and proper.

## SECOND COUNT
## Breach of Fiduciary Duty – Against Houk

50.    Irongate AI and Fuchsman repeat the previous allegations in the complaint.

51.    The parties to this action originally formed a partnership and created an LLC in order to develop a strategy for addressing America's datacenter problems and to further help America stay competitive in the datacenter space.

52.    Under the umbrella of the LLC, Houk and Fuchsman developed intellectual property/trade secrets, know-how, confidential business information, and confidential business strategies in order to address America's GPU Problem and offer a solution to both businesses and municipalities.

53.    The intellectual property and strategies were developed for Irongate AI, over the course of several months and belonged to Irongate AI.

54.    Irongate AI intended on using its intellectual property/trade secrets to secure business throughout the country, including in and around Midland Texas, which is the deal at the heart of this dispute.

55.     As a member of the LLC, Houk owed a fiduciary duty to the LLC as well as its other member, Alexander Fuchsman, requiring Houk to act in good faith and avoid conflicts of interest.

56.     In addition, as a member of the LLC, Houk was required to exercise reasonable care in making decisions for or on behalf of the LLC.

57.     In breach of the fiduciary duty owed to both Irongate AI and Fuchsman, Houk used the property of the LLC, including the intellectual property/trade secrets and other confidential business information and strategies, and leveraged that information to create an opportunity for himself and/or the LLC he created, to the detriment of the LLC.

58.     Indeed, Houk stole not only the intellectual property/trade secrets of Irongate AI but also interfered with a multi-million-dollar consulting deal that Houk and Fuchsman had originally secured for Irongate AI.

59.     In breach of his fiduciary duty and duty of loyalty to the LLC, Houk put his personal interests before those of the LLC and its other member, Fuchsman.

60.     The actions by Houk were not isolated Houk's conduct followed a clear and escalating pattern of concealment, obstruction, and sabotage—blocking system access, disparaging key personnel, and then permanently deleting corporate data—designed to frustrate oversight, delay accountability, and seize corporate opportunity for personal gain.

61.     As a result of Houk's actions, Irongate AI and Fuchsman have been damaged in an amount to be proven at trial, but believed to be the value of the Midland Texas consulting deal, as well as several other deals that plaintiffs believe that Houk is attempting to secure while improperly using the intellectual property/trade secrets of Irongate AI.

**WHEREFORE**, Irongate AI and Fuchsman demand judgment against Houk on this Second Count of the Complaint as follows:

a) Compensatory and punitive damages;
b) Interest and costs of suit;
c) Counsel fees as allowed by Court Rule;
d) Such other relief as the Court may deem just and proper.

## THIRD COUNT
## Tortious Interference with Contract – Against All Defendants

62.     Irongate AI and Fuchsman repeat the previous allegations in the complaint.

63.     The parties to this action originally formed a partnership and created an LLC in order to develop a strategy for addressing America's datacenter problems and to further help America stay competitive in the datacenter space.

64.     Under the umbrella of the LLC, Houk and Fuchsman developed intellectual property/trade secrets, know-how, confidential business information, and confidential business strategies in order to address America's GPU Problem and offer a solution to both businesses and municipalities.

65.     Irongate AI used its intellectual property/trade secrets and confidential business information and strategies to secure a consulting deal in connection with a 400 Mega-Watt datacenter project in or around Midland, Texas.

66.     Instead of finalizing the Midland Texas Deal for Irongate AI, defendants improperly and without authorization leveraged the intellectual property/trade secrets of Irongate AI to secure the Midland Texas Deal for themselves.

67.     In addition, on information and belief, defendants continue to leverage the Irongate AI intellectual property, trade secrets and confidential information and strategies to improperly seek additional business in the datacenter space.

68.    Defendants interfered with the Midland Texas Deal and effectively stole the deal from Irongate AI.

69.    As a proximate result of defendants actions – improperly leveraging the confidential business information of Irongate AI, to secure business for themselves – the defendants have caused damage to Irongate AI and Fuchsman in an amount to be proven at trial, but believed to be the value of the Midland Texas consulting deal, as well as several other deals that plaintiffs believe that Houk is attempting to secure while improperly using the intellectual property/trade secrets of Irongate AI.

**WHEREFORE**, Irongate AI and Fuchsman demand judgment against Defendants on this Third Count of the Complaint as follows:

a)  Compensatory and punitive damages;
b)  Interest and costs of suit;
c)  Counsel fees as allowed by Court Rule;
d)  Such other relief as the Court may deem just and proper.

## FOURTH COUNT
### Tortious Interference with Prospective Economic Advantage – Against All Defendants

70.    Irongate AI and Fuchsman repeat the previous allegations in the complaint.

71.    The parties to this action originally formed a partnership and created an LLC in order to develop a strategy for addressing America's datacenter problems and to further help America stay competitive in the datacenter space.

72.    Under the umbrella of the LLC, Houk and Fuchsman developed intellectual property/trade secrets, know-how, confidential business information, and confidential business strategies in order to address America's GPU Problem and offer a solution to both businesses and municipalities.

73.     Irongate AI used its intellectual property/trade secrets and confidential business information and strategies to secure a consulting deal in connection with a 400 Mega-Watt datacenter project in or around Midland, Texas.

74.     Instead of finalizing the Midland Texas Deal for Irongate AI, defendants improperly and without authorization leveraged the intellectual property/trade secrets of Irongate AI to secure the Midland Texas Deal for themselves.

75.     In addition, on information and belief, defendants continue to leverage the Irongate AI intellectual property, trade secrets and confidential information and strategies to improperly seek additional business in the datacenter space, all to the detriment of Irongate AI.

76.     Defendants interfered with the Midland Texas Deal and effectively stole the deal from Irongate AI.

77.     As a proximate result of defendants actions – improperly leveraging the confidential business information of Irongate AI, to secure business for themselves – the defendants have caused damage to Irongate AI and Fuchsman in an amount to be proven at trial, but believed to be the value of the Midland Texas consulting deal, as well as several other deals that plaintiffs believe that Houk is attempting to secure while improperly using the intellectual property/trade secrets of Irongate AI.

**WHEREFORE**, Irongate AI and Fuchsman demand judgment against Defendants on this Fourth Count of the Complaint as follows:

a)  Consequential and punitive damages;
b)  Interest and costs of suit;
c)  Counsel fees as allowed by Court Rule;
d)  Such other relief as the Court may deem just and proper.

## **FIFTH COUNT**
## **Fraud and Misrepresentation – Against All Defendants**

78.    Irongate AI and Fuchsman repeat the previous allegations in the complaint.

79.    The parties to this action originally formed a partnership and created an LLC in order to develop a strategy for addressing America's datacenter problems and to further help America stay competitive in the datacenter space.

80.    Under the umbrella of the LLC, Houk and Fuchsman developed intellectual property/trade secrets, know-how, confidential business information, and confidential business strategies in order to address America's GPU Problem and offer a solution to both businesses and municipalities.

81.    While the parties were actively seeking contracts for Irongate AI, including the Midland Texas consulting deal, at the heart of this litigation, Defendants were instead seeking to secure business for themselves – leveraging the Irongate AI intellectual property/trade secrets and confidential business information in order to do so.

82.    Defendants failed to inform Irongate AI and Fuchsman about their secret dealings to secure business for themselves, and in fact, in order to secure business behind the back of Fuchsman, Defendants actually blocked Fuchsman's access to Irongate AI emails as well as the Irongate AI Microsoft 365 Account.

83.    The defendants failure to inform Fuchsman of their improper business dealings and theft of trade secrets was a false representation or omission by defendants that was intended to lull plaintiffs into a sense of security that defendants were actually working for the benefit of the LLC.

84.    It wasn't until after defendants had stolen the Midland Texas Deal that defendants informed plaintiffs that the deal wasn't going forward through Irongate AI, but by then it was too late, as the deal was apparently secured separately by defendants.

85.    The consequences of Houk's actions extended beyond internal corporate harm. Several strategic partners and prospective investors relied on the financial and operational materials housed within the Microsoft 365 environment, many of which were deleted or materially altered. As a result, Plaintiffs were unable to satisfy due diligence inquiries and funding timelines were disrupted all to the detriment of Irongate AI.

86.    As a proximate result of defendants actions – secretly and improperly leveraging the confidential business information of Irongate AI, to secure business for themselves as well as covering his tracks through the deletion of emails and other critical corporate documents and information – the defendants have caused damage to Irongate AI and Fuchsman in an amount to be proven at trial, but believed to be the value of the Midland Texas consulting deal, as well as several other deals that plaintiffs believe that Houk is attempting to secure while improperly using the intellectual property/trade secrets of Irongate AI.

**WHEREFORE**, Irongate AI and Fuchsman demand judgment against Defendants on this Fifth Count of the Complaint as follows:

a)  Consequential and punitive damages;
b)  Interest and costs of suit;
c)  Counsel fees as allowed by Court Rule;
d)  Such other relief as the Court may deem just and proper.

### SIXTH COUNT
### Breach of Contract – Against Houk

87.    Irongate AI and Fuchsman repeat the previous allegations in the complaint.

88.    The parties to this action originally formed a partnership and created an LLC in order to develop a strategy for addressing America's datacenter problems and to further help America stay competitive in the datacenter space.

89.    Under the umbrella of the LLC, Houk and Fuchsman agreed that they would develop intellectual property/trade secrets, know-how, confidential business information, and confidential business strategies in order to address America's GPU Problem and offer a solution to both businesses and municipalities.

90.    The parties further agreed that they would work together for the benefit of the LLC and generate business for the LLC.

91.    Instead of generating business for Irongate AI, Houk instead leveraged the intellectual property/trade secrets of Irongate AI in order to secure business for himself.

92.    The actions of Houk breached the oral agreement between the parties by which they intended to work together to create innovative solutions to the GPU Problem, while generating business for the LLC.

93.    The breach of the oral agreement between Houk and the plaintiffs, has caused damage to Irongate AI and Fuchsman in an amount to be proven at trial agreement but believed to be the value of the Midland Texas consulting deal, as well as several other deals that plaintiffs believe that Houk is attempting to secure while improperly using the intellectual property/trade secrets of Irongate AI.

**WHEREFORE**, Irongate AI and Fuchsman demand judgment against Houk on this Sixth Count of the Complaint as follows:

a)  Consequential and punitive damages;
b)  Interest and costs of suit;
c)  Counsel fees as allowed by Court Rule;
d)  Such other relief as the Court may deem just and proper.

### SEVENTH COUNT
### Violation of Confidentiality Agreement – Against Houk

94.    Irongate AI and Fuchsman repeat the previous allegations in the complaint.

95.    In connection with the parties agreement to create an LLC and to secure business through the use of the intellectual property/trade secrets of the LLC and its confidential business information and strategies, Fuchsman and Houk signed a non-disclosure agreement.

96.    The non-disclosure agreement required Houk to protect the confidential information of Irongate AI from unauthorized disclosure.

97.    In violation of the non-disclosure agreement, Houk disclosed the intellectual property/trade secrets as well as the confidential business information, know-how, and strategies of Irongate AI to third parties without valid authorization to do so.

98.    Further, the unauthorized disclosures made by Houk were not for the benefit of Irongate AI or its members but instead were for the benefit of Houk and/or his other businesses.

99.    By his actions, Houk has violated the terms of the non-disclosure agreement as a result of which Irongate AI and Fuchsman have been damaged, in an amount to be proven at trial, but believed to be in excess of several million dollars.

**WHEREFORE**, Irongate AI and Fuchsman demand judgment against Houk on this Seventh Count of the Complaint as follows:

a)  Consequential and punitive damages;
b)  Interest and costs of suit;
c)  Counsel fees as allowed by Court Rule;
d)  Such other relief as the Court may deem just and proper.

## EIGHTH COUNT
### Removal/Expulsion from LLC – Against Houk

100.    Irongate AI and Fuchsman repeat the previous allegations in the complaint.

101.    The parties to this action originally formed a partnership and created an LLC in order to develop a strategy for addressing America's datacenter problems and to further help America stay competitive in the datacenter space.

102.    Under the umbrella of the LLC, Houk and Fuchsman developed intellectual property/trade secrets, know-how, confidential business information, and confidential business strategies in order to address America's GPU Problem and offer a solution to both businesses and municipalities.

103.    While the parties were actively seeking contracts for Irongate AI, including the Midland Texas consulting deal, at the heart of this litigation, Defendants were instead seeking to secure business for themselves – leveraging the Irongate AI intellectual property/trade secrets and confidential business information in order to do so.

104.    By seeking business for himself, at the expense of the LLC and its other members, Houk has not acted in the best interests of the LLC and has specifically breached his fiduciary duty and duty of loyalty owed to the LLC.

105.    By these breaches of fiduciary duty and the duty of loyalty, Houk should not be permitted to continue on as a member of Irongate AI and should therefore be compelled to be removed as a member of the LLC.

106.    As noted above, Houk refused to sign the draft operating agreement of Irongate AI, despite the parties incurring tens of thousands of dollars of legal fees in the preparation of the agreement, so the expulsion of Houk as an LLC member must be done by Court order.

107.    In addition, Irongate AI and Fuchsman request the return by defendants of any intellectual property/trade secrets, confidential business information, know-how, and confidential business strategies of Irongate AI in whatever form it may be (electronic, hardcopy or otherwise), to Irongate AI and Fuchsman

**WHEREFORE**, Irongate AI and Fuchsman demand judgment against Houk on this Eighth Count of the Complaint as follows:

a) For entry of an Order expelling and/or removing Houk as a member of Irongate AI, LLC

b) For entry of an Order requiring defendants to immediately return any and all intellectual property/trade secrets, confidential business information, know-how, and confidential business strategies of Irongate AI and Fuchsman, in whatever from they may exist (electronic, hardcopy or otherwise) to Irongate AI and Fuchsman.

c) Consequential and punitive damages;

d) Interest and costs of suit;

e) Counsel fees as allowed by Court Rule;

f) Such other relief as the Court may deem just and proper.

## NINTH COUNT
### Declaratory Judgment as to Ownership of Intellectual Property – Against All Defendants

108.    Irongate AI and Fuchsman repeat the previous allegations in the complaint.

109.    The parties to this action originally formed a partnership and created an LLC in order to develop a strategy for addressing America's datacenter problems and to further help America stay competitive in the datacenter space.

110.    Under the umbrella of the LLC, Houk and Fuchsman developed intellectual property/trade secrets, know-how, confidential business information, and confidential business strategies in order to address America's GPU Problem and offer a solution to both businesses and municipalities.

111.    While the parties were actively seeking contracts for Irongate AI, including the Midland Texas consulting deal, at the heart of this litigation, Defendants were instead seeking to secure business for themselves – leveraging the Irongate AI intellectual property/trade secrets and confidential business information in order to do so.

112.    Given the breaches of fiduciary duty of Houk, as alleged in this complaint, he can no longer be included as a member of Irongate AI nor can Houk be entitled to any of the rights associated with the parties development of intellectual property of Irongate AI.

113.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

114.    Here, Irongate AI and Fuchsman believe that they have exclusive ownership of any and all intellectual property/trade secrets, confidential business information, know-how, and confidential business strategies that were developed by the parties during the pendency of this endeavor, to address the datacenter GPU Problem, as described above.

115.    On the other hand, on information and belief, and certainly through the actions of Houk, as detailed in this complaint, defendants believe that they are entitled to use the intellectual property/trade secrets, confidential business information, know-how, and confidential business strategy of Irongate AI.

116.    A controversy therefore exists between the parties necessitating a declaration as to the rights and obligations of the parties as it relates to the intellectual property/trade secrets, confidential business information, know-how, and confidential business strategies of Irongate AI.

**WHEREFORE**, Irongate AI and Fuchsman demand judgment against Defendants on this Ninth Count of the Complaint as follows:

a) For entry of an Order declaring and adjudging that any intellectual property/trade secrets, confidential business information, know-how, and confidential business strategies developed by the parties are the sole and exclusive property of Irongate AI;
b) For entry of an Order declaring and adjudging that defendants must immediately return and/or make accessible, through electronic or other means, any and all intellectual property/trade secrets, confidential business information, know-how, and confidential business information of Irongate AI;
c) For entry of an Order requiring that after the production and return of the intellectual property/trade secrets, confidential business information, know-how, and confidential business information of Irongate AI to Irongate AI, that defendants are required to destroy any copies of the intellectual property/trade secrets, confidential business information, know-how, and confidential business information of Irongate AI;
d) Consequential and punitive damages;
e) Sanctions for violations, if any of the above Orders;

f)  Interest and costs of suit;
g)  Counsel fees as allowed by Court Rule;
h)  Such other relief as the Court may deem just and proper.

### TENTH COUNT
### Judicial Dissolution of LLC – Against All Defendants

117.    Irongate AI and Fuchsman repeat the previous allegations in the complaint.

118.    The parties to this action originally formed a partnership and created an LLC in order to develop a strategy for addressing America's datacenter problems and to further help America stay competitive in the datacenter space.

119.    Under the umbrella of the LLC, Houk and Fuchsman developed intellectual property/trade secrets, know-how, confidential business information, and confidential business strategies in order to address America's GPU Problem and offer a solution to both businesses and municipalities.

120.    While the parties were actively seeking contracts for Irongate AI, including the Midland Texas consulting deal, at the heart of this litigation, Defendants were instead seeking to secure business for themselves – leveraging the Irongate AI intellectual property/trade secrets and confidential business information in order to do so.

121.    By seeking business for himself, at the expense of the LLC and its other members, Houk has not acted in the best interests of the LLC and has specifically breached his fiduciary duty and duty of loyalty owed to the LLC.

122.    By these breaches of fiduciary duty and the duty of loyalty, Houk should not be permitted to continue on as a member of Irongate AI and should therefore be compelled to be removed as a member of the LLC.

123.    As noted above, Houk refused to sign the draft operating agreement of Irongate AI, despite the parties incurring tens of thousands of dollars of legal fees in the preparation of the agreement, so the expulsion of Houk as an LLC member must be done by Court order.

124.    In the event that removal of Houk as an LLC member is not permitted under applicable law, then Irongate AI and Fuchsman seek the involuntary dissolution of the LLC in accordance with applicable law.

125.    In addition, Irongate AI and Fuchsman request the return by defendants of any intellectual property/trade secrets, confidential business information, know-how, and confidential business strategies of Irongate AI in whatever form it may be (electronic, hardcopy or otherwise), to Irongate AI and Fuchsman.

**WHEREFORE**, Irongate and Fuchsman demand judgment against Defendants on this Tenth Count of the Complaint as follows:

a) For entry of an Order involuntarily dissolving Irongate AI, LLC;
b) For entry of an Order requiring defendants to immediately return any and all intellectual property/trade secrets, confidential business information, know-how, and confidential business strategies of Irongate AI and Fuchsman, in whatever form they may exist (electronic, hardcopy or otherwise) to Irongate AI and Fuchsman;
c) Consequential and punitive damages;
d) Interest and costs of suit;
e) Counsel fees as allowed by Court Rule;
f) Such other relief as the Court may deem just and proper.

## ELEVENTH COUNT
### Defamation and Disparagement – Against Houk

126.    Irongate AI and Fuchsman repeat the previous allegations in the complaint.

127.    While the parties were actively seeking business on behalf of Irongate AI, Houk purposefully and with the intent of harming Irongate AI and Fuchsman made disparaging and defamatory remarks about Fuchsman to potential partners and investors in the business.

128.   Houk made these defamatory and disparaging remarks about Fuchsman knowing that the remarks were false.

129.   The purpose of the disparaging and defamatory comments was to sow distrust amongst Irongate AI's partners and investors so that Houk could secure business for himself and exclude Fuchsman.

130.   On information and belief, the defamatory and disparaging comments made by Houk were both in writing and verbally.

131.   Moreover, during the time that Houk was making the disparaging and defamatory comments, he had blocked Fuchsman's access to Irongate AI's email and Microsoft 365 accounts, so he could hide the comments from Fuchsman.

132.   As a result of the disparaging and defamatory comments made by Houk, Fuchsman and Irongate have been damaged in an amount to be proven at trial, but believed to be the value of the Midland Texas consulting deal, as well as several other deals that plaintiffs believe that Houk is attempting to secure while improperly using the intellectual property/trade secrets of Irongate AI.

**WHEREFORE**, Irongate and Fuchsman demand judgment against Defendants on this Tenth Count of the Complaint as follows:

a)  Consequential and punitive damages;
b)  Interest and costs of suit;
c)  Counsel fees as allowed by Court Rule;
d)  Such other relief as the Court may deem just and proper.

DATED: April 9, 2025

Respectfully submitted,

  */s/ Joyce W. Lindauer*
Joyce W. Lindauer
State Bar No. 21555700
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972-503-4034
Email: joyce@joycelindauer.com

and

Ryan Milun (to be admitted *Pro Hac Vice*)
State Bar No. 043412006
The Milun Law Firm, LLC
Cranford Business Park
20 Commerce Drive, Suite 135
Cranford, New Jersey 07016
Telephone: (862) 702-5011
Ryan.milun@milunlw.com
Attorney for Plaintiffs

## **RULE 11 CERTIFICATION**

JOYCE W. LINDAUER declares as follows:

I am an attorney and owner of the law firm of Joyce W. Lindauer Attorney, PLLC, the attorneys for plaintiffs in this action. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 8, 2025

/s/ Joyce W. Lindauer
JOYCE W. LINDAUER